Stephanie M. Parent (OSB #925908)
Center for Biological Diversity
PO Box 11374
Portland, Oregon 97211
(971) 717-6404
sparent@biologicaldiversity.org

Hannah M. M. Connor (*Pro Hac Vice Pending*, FL Bar #125378)
Center for Biological Diversity
PO Box 2155
St. Petersburg, Florida 33731
(202) 681-1676
hconnor@biologicaldiversity.org

Attorneys for Plaintiff

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

## MEDFORD DIVISION

| | | |
|---|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, | ) ) ) | Case No. 1:17-cv-468 |
| Plaintiff, | ) ) | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| v. | ) ) | |
| UNITED STATES FISH AND WILDLIFE SERVICE, an agency in the Department of the Interior, | ) ) ) ) | (Environmental Matter—National Environmental Policy Act, National Wildlife Refuge System Administration Act, Kuchel Act, and Administrative |
| Defendant. | ) ) ) | Procedure Act) |

## INTRODUCTION

1.      This action challenges the United States Fish and Wildlife Service's (Service)

final decision to adopt a Comprehensive Conservation Plan (CCP) for five National Wildlife

Refuges in the Klamath Basin as set forth in the Service's Record of Decision (ROD), issued on January 13, 2017. The CCP is a comprehensive 15-year management plan for the Upper Klamath, Lower Klamath, Tule Lake, Clear Lake, and Bear Valley Refuges to achieve the purposes of the refuges and contribute to the mission of the National Wildlife Refuge System (the Refuge System). The Service must ensure the "programs" on the refuges are compatible with the purposes of the refuges as well as the maintenance of biological integrity, diversity, and environmental health.

2.     The Tule Lake and Lower Klamath National Wildlife Refuges were established as refuges and breeding grounds for birds. The purposes of the refuges also include wildlife conservation and the major purpose of wildlife management. The Service may allow agricultural use of these two refuges only if compatible with the purposes of the refuges and consistent with the major purpose of waterfowl management.

3.     The Service currently allows extensive agricultural use of Tule Lake and Lower Klamath Refuges to grow crops. As a component of the "Lease Land Farming Program" and the "Cooperative Farming Program," the Service allows the use of pesticides – insecticides, fungicides, herbicides, and rodenticides – on thousands of acres of refuge land. Under the CCP, the Service will continue to allow the use of pesticides in the same manner as prior to the adoption of the CCP, despite the fact that the application of pesticides has numerous adverse effects on native species, their food, ecosystems, and ecological processes, undermines the biological integrity, diversity, and environmental health of the refuges, and is contrary to the National Wildlife Refuge System Administration Act (Refuge Act) and the purposes of these refuges.

4.     In making determinations that private economic use of pesticides for commercial agriculture on the Tule Lake and Lower Klamath Refuges are compatible and consistent with their purposes, the Service failed to apply sound scientific principles, consider available information, and adhere to legal obligations and its own policies for analyzing the likely impacts.

5.     The Service attempted to address its obligations under the National Environmental Policy Act (NEPA) prior to adopting the CCP. The Service issued an environmental impact statement (EIS) that should have disclosed and evaluated the direct, indirect, and cumulative effects of the proposed CCP, and each alternative of a reasonable range of alternatives to sharply define the issues and provide a clear basis for choice among the options by the public and the agency decisionmaker.  Instead, with respect to agricultural use of pesticides, the Service allows the continued use of pesticides in the same manner as prior to the CCP for all alternatives. The Service did not consider any alternatives that would reduce the effects of pesticides by prohibiting the use of pesticides known to be harmful to wildlife or to their food, by prohibiting crops that require extensive pesticide use, by prohibiting aerial spraying of pesticides, or by allowing only organic farming or other reasonable alternatives.

6.     In the EIS, the Service also failed to disclose and analyze the specific direct, indirect, and cumulative effects of the agricultural use of pesticides. Instead, the Service relies on a 1998 programmatic Integrated Pest Management Plan and a 2007 programmatic biological opinion, which in turn rely upon a Pesticide Use Proposal process that is not open to the public and does not involve NEPA analysis or result in a NEPA document. As of 2007, the Service had not conducted any systematic field-wide studies of pesticide impacts since it began using the Pesticide Use Proposal process and no recent systematic studies are discussed in the EIS. The

EIS only lists pesticides approved for use and makes the same general statements about the potential effects of the use of pesticides for each alternative.

7.      Plaintiff Center for Biological Diversity seeks a declaration that the Service violated NEPA, 42 U.S.C. § 4321 *et seq*.; the Refuge Act, as amended by the National Wildlife Refuge System Improvement Act, 16 U.S.C. § 668dd *et seq*.; and the Kuchel Act, 16 U.S.C. § 695k *et seq*. through its issuance of the ROD approving the CCP. Plaintiff requests that this Court set aside the ROD and CCP pursuant to the Administrative Procedure Act (AP), 5 U.S.C. § 706(2). Additionally, Plaintiff requests that the Court issue injunctive relief to remedy these violations of law. Should Plaintiff prevail, Plaintiff will seek reasonable attorneys' fees and costs pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412(d).

## JURISDICTION AND VENUE

8.      Plaintiff brings this suit pursuant to the Administrative Procedure Act, 5 U.S.C. § 706 (APA).

9.      This Court has jurisdiction under 28 U.S.C. § 1331 (federal question) because this action arises under the laws of the United States, including the APA, NEPA, and the Refuge Act.

10.     An actual, justiciable controversy exists between Plaintiff and Defendant. The relief Plaintiff requests is proper under 28 U.S.C. §§ 2201–02.

11.     Venue lies in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims herein occurred within this judicial district, a substantial amount of the public lands and resources involved are located in this district, Plaintiff maintains an office located within this district, and many of Plaintiff's affected members reside here.

12.     Defendant waived sovereign immunity in this action pursuant to 5 U.S.C. § 702.

## PARTIES

13.    Plaintiff Center for Biological Diversity (Center) is a non-profit 501(c)(3) conservation organization dedicated to the protection of native species and their habitats through science, policy, and environmental law. The Center has more than 52,000 active members across the country, including in Oregon. The Center has an office in Portland, Oregon.

14.    The Center and its members are concerned with and actively seek to secure programmatic changes in the pesticide registration process and to stop toxic pesticides from harming birds, fish and other wildlife and from contaminating their habitats and harming their food sources. The Center advocates against the harmful and unnecessary use of pesticides and for sustainable agricultural solutions. The Center comments on and litigates over agency decisions that allow the harmful and unnecessary use of pesticides, including comments on the draft CCP/EIS and litigation concerning some of the pesticides the Service allows to be used on the Tule Lake and Lower Klamath Refuges.

15.    The Center has staff and members who live in or visit the refuges impacted by the agricultural use of pesticides. The Center, its staff, and its members are concerned with the conservation of birds, wildlife, and their habitats, which are found on the Refuges and may be impacted by pesticide use, including Trumpeter Swan, Bald Eagle, Brant Goose, and Greater White-fronted Goose, as well as many other birds and wildlife that depend on the refuges for food and habitat. The Center, its staff, and its members are also concerned with the effective management of our national wildlife refuges, achievement of the purposes of the refuges, and implementation of NEPA.

16.    The Center has members who have visited the Lower Klamath and Tule Lake Refuges. The Center's members use these areas for observation of the birds, including Tundra

Swan and Yellow Rail, and other wildlife on the refuges, research, nature photography, aesthetic enjoyment, recreation, education, and other activities. The Center's members derive professional, aesthetic, spiritual, recreational, economic, information, and educational benefits from these species and their habitat. These members have concrete plans to continue visiting and recreating in areas where they can observe and enjoy these species and their habitat.

17.     The Center and its members' substantive and procedural interests have been and continue to be directly and adversely affected and injured by the Service's failure to comply with NEPA, the Refuge Act, and the Kuchel Act, including: their interests in the birds and other wildlife on the refuges; their interests in being fully informed of the actual and potential effects of pesticide use on the refuges; and their interest in fully participating in the process to develop the CCP and manage the refuges.

18.     Unless the requested relief is granted, the Center's interests and the interests of its members will continue to suffer ongoing and irreparable adverse effects and injury from the Service's violations.

19.     Defendant, United States Fish and Wildlife Service, is an agency within the Department of Interior, and is responsible for administration of the National Wildlife Refuge System, including the Klamath Basin Refuges, in accordance with federal laws, regulations, and policies.

**LEGAL BACKGROUND**

National Wildlife Refuge Administration

20.     In 1966, Congress passed the Refuge Act. 16 U.S.C. § 668dd(a)(1).

21.     The mission of the Refuge System is "to administer a national network of lands and waters for the conservation, management, and where appropriate, restoration of the fish,

wildlife, and plant resources and their habitats within the United States. . . ." *Id*. § 668dd(a)(2).

"Conservation" and "management" mean "to sustain and, where appropriate, restore and

enhance, healthy populations of fish, wildlife, and plants" in accordance with Federal laws. *Id*. §

668ee(4). The Service must also "ensure that the biological integrity, diversity, and

environmental health" of national wildlife refuges are maintained. *Id*. § 668dd(a)(4)(B). Each

refuge must be managed to ensure the purposes for which the refuge was established are carried

out. *Id*. § 668(a)(4)(D).

22.    In 1997, Congress amended the Refuge Act with the passage of the National

Wildlife Refuge System Improvement Act (Improvement Act). Under the Improvement Act, the

Service must issue a "comprehensive conservation plan for each refuge or . . . complex of

refuges . . . in the [refuge] System" and subsequently "manage the refuge[s] . . . in a manner

consistent with the plan." *Id*. § 668dd(e)(1)(A), (E). The CCP must "identify and describe . . . the

distribution, migration patterns, and abundance of fish, wildlife, and plant populations and

related habitats within" the refuge, as well as "significant problems that may adversely affect the

populations and habitats of fish, wildlife, and plants" and "the actions necessary to correct or

mitigate such problems." *Id*. § 668dd(e)(2)(B), (E).

23.    The Service may "permit the use of any area . . . for any purpose . . . whenever [it]

determines that such uses are compatible with the major purposes" of a refuge. *Id*. §

668dd(d)(1)(A). Purposes of a refuge are those "derived from the law, proclamation, Executive

order," or other means of establishing or expanding the refuge. *Id*. § 668ee(10). The Service

"shall not initiate or permit a new use of a refuge or expand, renew, or extend an existing use of a

refuge, unless [it] has determined that the use is a compatible use." *Id*. § 668dd(d)(3)(A).

24.    A "compatible use" is any use of a refuge that, based on "sound professional judgment, [] will not materially interfere with or detract from the fulfillment of the mission of the System or the purposes of the refuge." *Id*. § 668ee(1); 50 C.F.R. § 25.12. To be compatible, a use must also contribute to the maintenance of biological integrity, diversity, and environmental health. 603 FW 2. Sound professional judgment means "a finding, determination, or decision that is consistent with the principles of sound fish and wildlife management and administration, available science and resources, and adherence to the requirements of [the Refuge] Act and other applicable laws." 16 U.S.C. § 668ee(3).

25.    When a use is incompatible, the Service will "expeditiously terminate or modify the use to make it compatible." 50 C.F.R. § 26.41(d).

26.    If the use is a "public or private economic use of the natural resources of any national wildlife refuge," the Service may only authorize the use where it "determine[s] that the use contributes to the achievement of the national wildlife refuge purposes or the National Wildlife Refuge System mission." 50 C.F.R. § 29.1.

27.    The Service must evaluate each refuge use in a written compatibility determination. 16 U.S.C. § 668dd(d)(3)(B). Compatibility Determinations are typically made as part of the CCP process. 50 C.F.R. § 26.41.

28.    In determining whether a use is compatible, the Service must consider the anticipated impacts of the use on the refuge's purpose and on the mission of the National Wildlife Refuge System. 50 C.F.R. § 26.41(a)(8). Impacts that the Service must be consider include direct impacts, "indirect impacts associated with the use," and cumulative impacts including "uses of adjacent lands or waters that may exacerbate the effects of refuge use." 603 FW §§ 2.11(B)(3), 2.12(A)(8)(c).

29. The Compatibility Determination must "[d]escribe the specific areas of the refuge that will be used: habitat types and acres involved [and] key fish, wildlife, and plants that occur in or use that habitat," including other areas that may be affected incidentally. *Id*. § 2.12(A)(6)(b). Uses that are reasonably anticipated "to reduce the quality or quantity or fragment habitats on a national wildlife refuge will not be compatible." *Id*. § 2.5(A).

30. Even if a use is compatible, the Service may decline to allow it. 603 FW § 1.8; 603 FW §§ 2.11(G), 2.15.

31. Under the 1964 Kuchel Act, the Service must manage the Lower Klamath and Tule Lake Wildlife Refuges for wildlife conservation, including waterfowl management, and may only allow agricultural use of those refuges if it is "consistent" with wildlife conservation.16 U.S.C. § 695l.

National Environmental Policy Act

32. The Service must comply with the disclosure and analysis requirements of NEPA prior to issuance of a CCP and Compatibility Determinations. NEPA's primary purposes are to ensure that agencies have available and carefully consider detailed information concerning the environmental consequences of their actions, and to ensure that the public has sufficient information to play its role in the decisionmaking process. 40 C.F.R. § 1500.1(b), (c).

33. An agency must prepare an EIS for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). The EIS must adequately describe the affected environment, and disclose the environmental consequences of the proposed action and each of the alternatives to the proposed action. 40 C.F.R. § 1502. The agency's statements "shall be supported by evidence that the agency has made the necessary environmental analyses." *Id*. § 1502.1.

34.    An agency must study, develop, and describe an appropriate range of alternatives in the EIS. *Id*. § 4332(C)(iii), (E). This requirement serves to "inform decisionmakers and the public of reasonable alternatives that would avoid or minimize adverse impacts" of a proposal. 40 C.F.R. § 1502.1. The agency should present the environmental impacts of the proposed action and the impacts of the alternatives "in comparative form, thus sharply defining the issues and providing a clear basis of choice among the options." 40 C.F.R. § 1502.14. Alternatives are "the heart of the environmental impact statement," and the agency must "rigorously explore and objectively evaluate all reasonable alternatives." *Id*.

35.    An EIS must include a "no action" alternative. *Id*. The no action alternative provides a benchmark that allows decisionmakers and the public to compare the magnitude of the effect of the action alternatives on the environment.

36.    The EIS must also include "reasonable alternatives not within the jurisdiction of the lead agency." *Id*.

37.    An agency must disclose and analyze the environmental consequences of the proposed action and each alternative to the proposed action. This provides the scientific basis to compare alternatives. In this analysis, an agency must consider three types of environmental impacts or effects in the EIS: those that are direct, indirect, and cumulative. 40 C.F.R. § 1508.25(c). Direct effects "are caused by the action and occur at the same time and place." *Id*. § 1508.8(a). Indirect effects are "caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable." *Id*. § 1508.8(b). A cumulative impact results from the incremental impact of the proposed action when added to other past, present, and reasonably foreseeable future actions, regardless of what agency undertakes such other actions. *Id*. § 1508.7. Cumulative impacts can result from individually minor but collectively significant actions taking

place over a period of time. *Id*. The agency cannot avoid significance by dividing a proposed project into component parts. *Id*. § 1508.27(b)(7).

38.    An agency must make high quality information available to the public before an agency makes its decision and takes action. *Id*. § 1500.1(b). Accurate scientific analysis and public scrutiny are essential to implementing NEPA. *Id*. Agencies shall insure the professional and scientific integrity of the discussions and analyses in the EIS. *Id.* § 1502.24. Conclusions about environmental effects must be preceded by analysis that supports that conclusion unless explicit reference by footnote is made to other supporting documentation that is readily available to the public. 516 Departmental Manual (DM) 4.14.

39.    Agencies incorporate material into an EIS by reference when the effect will be to cut down on bulk without impeding agency and public review of the action. 40 C.F.R. § 1502.21. No material may be incorporated by reference unless it is reasonably available for inspection by potentially interested persons within the time allowed for comment. *Id.* 1502.21. When the Service incorporates material by reference, citations concerning specific topics must include the pertinent page numbers. 516 DM 4.12.

40.    When an agency is evaluating reasonably foreseeable significant adverse effects in an EIS and there is incomplete or unavailable information, the agency shall always make clear that such information is lacking. 40 C.F.R. § 1502.22. If the incomplete information relevant to significant adverse impacts is essential to a reasoned choice among alternatives and the overall costs of obtaining it are not exorbitant, the agency shall include the information in the EIS. *Id.* § 1502.22(a).

Administrative Procedure Act

41.     The APA confers a right of judicial review on any person that is adversely

affected by a federal agency action. 5 U.S.C. § 702. Upon review, the Court shall "hold unlawful

and set aside agency actions . . . found to be arbitrary, capricious, and abuse of discretion, or

otherwise not in accordance with law." *Id*. § 706(2)(A).

## FACTUAL BACKGROUND

42.     The Klamath National Wildlife Refuge Complex includes six refuges: Upper

Klamath, Lower Klamath, Tule Lake, Clear Lake, Bear Valley, and Klamath Marsh. The Refuge

Complex was established to conserve much of the Klamath Basin's remaining wetland habitat,

which provides home to many species of migratory and other birds, wildlife, and plants.

43.     In May 2016, the Service released its Draft CCP/EIS for the Upper Klamath,

Lower Klamath, Bear Valley, Clear Lake, and Tule Lake Refuges, along with draft

Compatibility Determinations. The Center submitted timely comments on the Draft CCP/EIS.

44.     On December 8, 2016, the Service released the Final CCP/EIS for the Refuge

Complex and final Compatibility Determinations, with a notice of availability on the following

day. *See* Final Comprehensive Conservation Plan/Environmental Impact Statement, 81 Fed. Reg.

89,138 (Dec. 9, 2016).

45.     The Service signed a ROD for the CCP on January 13, 2017.

46.     The purposes of the CCP/EIS include: ensuring that management programs on the

refuges are consistent with legal mandates and the purposes for which each refuge was

established; evaluating existing and proposed uses of each refuges to ensure that they are

compatible with the purposes of the refuge as well as the maintenance of biological integrity,

diversity, and environmental health; and providing an opportunity for the public to help shape the future management of the refuges.

47.    The Lower Klamath National Wildlife Refuge was established "as a preserve and breeding ground for native birds" in 1908. Executive Order 924 (Aug. 8, 1908). The Tule Lake National Wildlife Refuge was established in 1928 "as a refuge and breeding ground for birds." Executive Order 4975 (1928). The purposes established by the Kuchel Act also apply to the Lower Klamath and Tule Lake Refuges, including that they are "dedicated to wildlife conservation . . . for the major purpose of waterfowl management, but with full consideration to optimum agricultural use that is consistent therewith." 16 U.S.C. § 695l.

48.    The Service allows agricultural uses on the Lower Klamath and Tule Lake Refuges. These agricultural uses constitute economic uses of the refuges, and are, therefore, subject to review under the compatibility standard of the Refuge Act and must be consistent with wildlife conservation and waterfowl management pursuant to the Kuchel Act.

49.    The Tule Lake Refuge consists of 39,116 acres. The Service allows the lease of about 14,800 acres for agricultural use as part of the "Lease Land Farming Program" and allows sharecrop farming on about 2,250 to 2,500 acres as part of the "Cooperative Farming Program." About half of the cooperatively farmed fields are organic or transitioning to organic. The primary crops grown on the Tule Lake Refuge include barley, oats, wheat, potatoes and onions.

50.    The Lower Klamath Refuge consists of approximately 50,913 acres of federal land. The Service leases about 6,254 acres for agricultural use as part of the "Lease Land Farming Program" and agricultural uses include growing barley, oats and wheat. The Service allows sharecrop farming on up to 8,000 acres as part of the "Cooperative Farming Program" on which only cereal grain (usually barley) is produced.

51.     The Service retains ultimate administrative control of all activities on the Refuge Complex. The Service allows the application of chemical pesticides in the "Cooperative Farming Program" and the "Lease Land Farming Program." The Service administers cooperative farming through Special Use Permits. The Bureau of Reclamation administers the agricultural leasing program, including pesticide use, via a Cooperative Agreement with the Service. The lease contract may include limitations on the use of chemicals.

52.     There are up to 22,000 acres of lease lands at Lower Klamath and Tule Lake Refuges combined. In the CCP/EIS, the Service reports that it allowed the application of pesticides on lease lands at these two refuges on at least 53,342 acres in 2008, 63,362 acres in 2009, 31,220 acres in 2010, 62,879 acres in 2011, 67,475 acres in 2012, 96,691 acres in 2013, and 78,793 acres in 2014.

53.     At Tule Lake Refuge, the Service allows cooperative farmers with conventional fields to use the same array of pesticides authorized for use on lease lands. Pesticide applications to cooperative farm fields at Tule Lake Refuge ranged from 407 acres in 2013 to 1735 acres in 2014.

54.     The Service does not disclose in the CCP/EIS which pesticides or combination of pesticides were actually applied or the rate of application or what volume of pesticides were applied to the lease lands at Lower Klamath and Tule Lake Refuges or to the cooperative farm units at Tule Lake Refuge.

55.     On the Lower Klamath Refuge, application of pesticides on cooperative farming units ranged from 942 acres in 2011 to 0 acres in 2014 and from 222.75 gallons in 2012 to 0 gallons in 2014. In the SUPs, the Service limited the pesticides authorized for use on wheat, barley, or oats on the Lower Klamath cooperative farming units to one application of a small

number of herbicides, including, but not limited to, pesticides with the following active

ingredients: dicamba; 2,4-D; MCPA; and glyphosate. The Service does not disclose in the

CCP/EIS which pesticides were actually applied or the rate of application to the cooperative farm

units at Lower Klamath Refuge.

56.    The Service allows commercial production of potatoes on the Tule Lake Refuge

leased lands. Since 1957, the Service has typically allowed an increase in the acres planted in

potatoes, and, in recent years, generally allows between 2,000 and 3,000 acres of potatoes. In the

CCP/EIS, the Service lists the pesticides authorized for use on potatoes on "Tule Lake Refuge

Cooperative Lease Land Farmlands" as including, but not limited to, pesticides with the

following active ingredients: imidacloprid; flonicamid; thiamethoxam; thiamethoxam +

fludioxonil; pymetrozine; spirotetramat; spinosad; pyrethrins; indoxacarb; metribuzin; copper

hydroxide; fluopyram + pyrimethanil; azoxystrobin; mancozeb; fludioxonil + mancozeb;

fefenoxam + mancozeb; mefenoxam + chlorothalonil; glyphosate; metribuzin; rimsulfuron;

clethodim; sethoxydim; famoxadone + cymoxanil; and 1,3-dichloropropene.

57.    The Service allows the production of onions on Tule Lake Refuge leased lands.

Since 1957, the Service has generally allowed an increase in the acres planted in onions, with

only 33 acres in 1957 and over 1,000 acres in three of the five most recent years of data provided

in the CCP/EIS. The Service does not list the pesticides authorized for use on onions in the

CCP/EIS. In 2015, the Service and others approved the use of numerous pesticides for use on

onions including, but not limited to, pesticides with the following active ingredients:

chlorpyrifos; malathion; clethodim; acetamiprid; azadirachtin; chlorothalonil; copper hydroxide;

ethofumesate; tebuconazole; fluzaifop-P-butyl; oxyfluorfen; spirotetramat; permethrin;

pyrethrins; azoxystrobin; spinetoram; spinosad; mefenoxam + mancozeb; glyphosate;

pyrimethanil; clethodim; and oxamyl. For many of the pesticides approved for use on onions in 2015, the "management action/economic threshold" was "unknown."

58.     In the CCP/EIS, the Service lists the pesticides authorized for use on wheat, barley, or oats on "Tule Lake Refuge Cooperative Lease Land Farmlands" as including, but not limited to, pesticides with the following active ingredients: malathion; dimethoate; spinosad; dicamba; MCPA; 2,4-D; tribenuron-methyl; ipconazole; mefenoxam; glyphosate; rimsulfuron; pinoxaden; azoxystrobin; azoxystrobin + propiconazole; triticonazole; triticonazole + metalaxyl; tebuconazole + thiram; carboxin + thiram; difenoconazole + mefenoxam; and prothioconazole + tebuconazole + metalaxyl.

59.     Other than giving examples of the effects of glyphosate, the Service does not disclose the known, potential adverse effects of the use of the listed pesticides in the CCP/EIS. For example, the Service does not disclose that:

a) chlorpyrifos is an organophosphate insecticide that is "of concern" to the Department of the Interior and that it: is a neurotoxin; is very highly toxic to many species of fish and aquatic invertebrates; is highly toxic to bees and beneficial insects; chronic, low-dose exposure can lead to reduced growth, impaired swimming and reduced olfaction, which limits reproductive effectiveness of salmon; can persist longer than 1000 days in certain soil conditions; has the potential for long-range transport in the atmosphere; and its common metabolite is 100 to 1000 times more potent a neurotoxin;

b) imidacloprid is a neonicotinoid insectide that: is harmful to many bird species, especially when using seeds coated with it, can cause death and adversely affect ability to fly and coordinate movement; is an endocrine disrupter in birds at low doses; is very

highly toxic to non-target insects; negatively impacts bees and other beneficial insects; and is persistent and highly mobile in soil, and is liable to runoff into surface waters;

c) clothianidin is a neonicotinoid insecticide that: is very highly toxic to aquatic intertebrates; is highly toxic to bees on both a contact and oral basis; can kill bees, adversely affect their behavior, and negatively impact their immune system; is persistent and has a soil half-life of 545 days; and is prone to contaminating surface and groundwater;

d) thiamethoxam is a neonicotinoid insecticide that: breaks down to clothianidin once metabolized by plants; adversely affects birds; and is toxic to non-target insect and arthropod species, including impairment of bumblebee learning and short –term memory and causing immune system defects in bees;

e) mancozeb is a fungicide that: is highly toxic to freshwater fish and invertebrates; and adversely affects salamanders and frogs based on directly due to deposition on food and indirectly adversely affects their habitat and food sources;

f) chlorothalonil is a fungicide that: is very highly toxic to fish; can bioconcentrate in fish; is very toxic to freshwater invertebrates; can result in death and developmental abnormalities in amphibians; and can travel far from its application site and its metabolite has the potential to leach and accumulate annually in soil;

g) dicamba is an herbicide that: is volatile and prone to extensive spray drift which can impact non-target plants and reduce available resources for pollinators; does not absorb to soil and is highly mobile with the potential to persist in water; can adversely affect small birds and mammals that forage on plants or insects in treated fields; and may affect foraging behavior of mammals chronically exposed to dicamba;

h) 2,4-D is an herbicide that: is volatile and highly prone to drift which can impact non-target plants and reduce available resources for pollinators; certain formulations are highly toxic to freshwater fish; can damage DNA; and in 2015, the World Health Organization's International Agency for Research on Cancer determined 2,4-D to be possibly carcinogenic to humans.

60.    In addition to failing to disclose these general, known effects of the use of approved pesticides, the Service does not disclose or analyze the specific effects of the actual agricultural use of these pesticides on the Refuges, including glyphosate, on the numerous birds, fish, invertebrates, other wildlife and plants that live and depend on the Refuges for habitat and food.

61.    The Service states that the effects on the physical environment of the ongoing pest management program for the leased farmlands on the Refuges are assessed in the 1998 *Integrated Pest Management Plan and Environmental Assessment for Leased Lands at Lower Klamath and Tule Lake National Wildlife Refuges, Oregon/California* (1998 IPM Plan). The 1998 IPM Plan is programmatic. The 1998 IPM Plan environmental assessment did not disclose or analyze the adverse effects of the use of specific pesticides on specific refuge birds or other wildlife. It does not disclose the impacts of the implementation of the 1998 IPM Plan over the last 18 years, nor does it assess the potential site-specific impacts of the continued agricultural use of pesticides as adopted in the CCP/EIS. The 1998 IPM Plan requires a comprehensive review every five years. The Service does not disclose whether comprehensive reviews occurred or the results of the comprehensive reviews of the 1998 IPM Plan in the CCP/EIS.

62.    The goal of the 1998 IPM Plan is to minimize the use of pesticides associated with agricultural practices on the leased land over time. Incomplete information the Service

disclosed in the CCP/EIS concerning pesticide use on lease lands generally shows an increasing trend from 2008 to 2014.

63.    The 1998 IPM Plan continued to include onions and potatoes as lease land crops with the goal to incorporate other crops that require less chemical input and comparable profits. In Appendix G, the compatibility determination for lease land farming on Tule Lake Refuge shows that from 2010 to 2014, the acres planted in potatoes increased from 755 to 2,419 (with 3,235 acres in 2011) and the acres planted in onions increased from 218 in 2010 to 1,526 in 2014.

64.    A component of the IPM Plan is the use of a Pesticide Use Proposal (PUP) process to authorize the application of pesticides on the refuge. A PUP describes the type of chemical proposed for use, the pest intended for control, the general treatment site, and any sensitive areas near the treatment site that may need special attention. The PUPs are reviewed and approved by the Lease Land PUP Committee. All PUPs are stored in the Pesticide Use Proposal System (PUPS), a centralized database accessible only to Service employees. The PUP approvals are not NEPA documents. The PUP approval process is not open to the public or subject to public comment.

65.    The Service uses the U.S. Environmental Protection Agency's 2004 Ecological Risk Assessment Process (2004 EPA Risk Assessment) in the PUP process to determine the potential direct adverse effects to fish and wildlife. To estimate potential effects from acute exposure to a pesticide active ingredient, the 2004 EPA Risk Assessment uses studies based on Median Lethal Concentration ($LC_{50}$) for fish and birds and uses Oral Lethal Dose ($LD_{50}$) for mammals. $LC_{50}$ and $LD_{50}$ are the concentration or dose at which 50% of the laboratory test population is killed.

66.    The 2004 EPA Risk Assessment uses studies on surrogate species that do not consider interspecies sensitivity. The 2004 EPA Risk Assessment allows the use of studies that assess exposure to the active ingredient, not the chemical mixture contained in the pesticide product. The 2004 EPA Risk Assessment does not evaluate additive or synergistic effects that may occur from applying two or more pesticides or additives in a single application, co-location of pesticides in the environment, cumulative effects from pesticides with the same mode of action, effects of multiple stressors and behavioral changes induced by exposure to pesticides. The 2004 EPA Risk Assessment does not consider exposure through inhalation of pesticides, exposure to dusts contaminated with pesticides, dermal exposure, or exposure from consumption of dew or other water on treated surfaces. The 2004 EPA Risk Assessment does not evaluate indirect effects associated with pesticide applications. It does not evaluate the cumulative effects of pesticide use on the Refuges and pesticide use adjacent to the Refuges. The 2004 EPA Risk Assessment does not evaluate the impacts on pollinators or other beneficial insects. In response to comments that the PUP process is inadequate, the Service recognized that there are more in depth and more improved processes available.

67.    The Service incorporated by reference a 2007 Biological Opinion, "Formal Consultation for the Implementation of the Pesticide Use Program on Federal Lease Lands, Tule Lake and Lower Klamath National Wildlife Refuges."

68.    The 2007 Biological Opinion concerns the implementation of the PUP process at a programmatic level. The 2006 Biological Evaluation that initiated the consultation that resulted in the 2007 Biological Opinion describes the action as a programmatic approach to the pesticide use program that evaluates broad consideration of its effects.

69.    The 2006 Biological Evaluation states that pesticides are routinely applied to most crops, except those grown organically. Herbicides are most frequently used; fungicides are second most frequently used for disease control on onions and potatoes; and insecticides are third most frequently used on row crops that are routinely treated to control a complex of lepidopteron pests in potatoes and onion thrips in onions.

70.    The 2007 Biological Opinion states that since the institution of PUPs on the Refuges in 1994, no systematic field-wide studies of pesticide impacts have been conducted.

71.    The most recent information on the effects of pesticide use on birds discussed in the 2007 Biological Opinion, Hawkes and Haas (2005), monitored pesticide exposure and reproductive success in starlings and American kestrels during 2002 and 2003. The results included: the percent hatch of starlings showed a significant negative correlation with the number of fungicide applications; brain cholinesterase reactivation indicated 14% of nestlings found dead were likely exposed to carbamate insecticides; and dietary analysis indicated nestling exposure to dicamba and 2,4-D, as well as numerous pesticides that are not approved for Refuge use (aldicarb, carbofuran, propazine, simazine and dichlorprop). An earlier study determined that indirect effects of pesticides are probably impacting birds, such as longer nest season and smaller eggs. Insects are an important food source for waterfowl, particularly during spring breeding and in the diets of young waterfowl because they provide required protein and amino acids. It does not appear that the Service has studied, disclosed, or analyzed the impacts of pesticide use on this important food source on the refuges.

72.    The 2006 Biological Evaluation states that the Klamath Basin PUP committee will annually evaluate the need for the Bureau of Reclamation to implement Service-approved monitoring programs for pesticide residues in soil, sediment, and water resources within or

intimately connected to the action area. The CCP/EIS does not disclose the results of the evaluation of need for monitoring or whether the Bureau of Reclamation implemented any Service-approved monitoring programs.

73.    The CCP/EIS states that current contaminant threats and impacts on wetlands from pesticide application were uncertain due to lack of monitoring data; further, specific assessments do not exist, and the CCP/EIS does not assess the overall costs of obtaining such information.

74.    Between the Draft CCP/EIS and the Final CCP/EIS, the Service added a description of water sampling taken every 2 weeks during the pesticide application season, from April through October, at Tule Lake in 2007 and 2011. In 2007, out of 51 samples, two pesticide detections (2,4-D and carbaryl) "met data quality standards." Other pesticide detections (chlorpyrifos, oxyfluorfen and pendimethalin) "may not have been valid" for failure to meet data quality objectives or due to in-laboratory contamination. In at least several instances, duplicate samples were not collected and/or the regular sample was not reanalyzed. The Service does not disclose the number of samples collected in 2011 or how many met data quality standards. In 2011, at least two samples detected bifenthrin and one sample detected prodiamine.

75.    In the CCP/EIS, the Service makes only general statements about the potential impacts of the use of pesticides for all alternatives, including:

a) with respect to soils, pesticides can fall on the soil surface due to a variety of reasons, some pesticides may remain at or near the soil surface for extended periods of time, and the existence of some pesticides or their decomposition products in the soil profile could prove toxic to some soil-dwelling organisms and plants;

b) with respect to the water quality, pesticides can enter surface water due to a variety of reasons, some pesticides may remain in surface or shallow subsurface waters for extended periods of time, and the existence of some pesticides or their decomposition products in water could prove toxic to some aquatic plants and/or animals;

c) with respect to air quality, pesticides may travel through the air, or volatilize into the air or remain suspended in the air, and, once airborne, pesticides can move off the pest control site, and these effects would be more pronounced with aerial spraying;

d) with respect to vegetation and habitat resources, by their nature, pesticides are toxic, broad spectrum (non-selective) herbicide kill all plants that receive an adequate dose and selective herbicides kill certain types of plants, and, in addition to killing plants, herbicides may cause other effects such as stunted growth or preclude seeds from emerging. In general, younger and herbaceous plants are the most sensitive to herbicides;

e) with respect to fish and wildlife, on Tule Lake Refuge, insecticides have the potential for adverse ecological impacts, toxicity to animals, including beneficial insects, and humans, and biomagnifications up the food chain;

f) with respect to fish and wildlife, between the Draft CCP/EIS and the Final CCP/EIS, the Service added that on Tule Lake Refuge, indirect impacts could result by eliminating potential pollinators, by reducing prey available to some reptile or avian species, by reducing green matter or seeds for herbivorous and granivorous species, and by reducing potential prey source for raptors, and that on Lower Klamath Refuge, pesticide application to treated crops could result in indirect impacts by reducing green matter or seeds for herbivorous and granivorous species and negligible short-term adverse effects by reducing a potential prey source for animals that consume invertebrates.

Tule Lake Refuge Alternatives

76.    The Service considered three alternatives for the Tule Lake Refuge. In all alternatives, primary crops on lease lands include barley, oats, wheat, onions, potatoes, and alfalfa. In all alternatives, on cooperative farm lands, the Service would allow cereal grains and potatoes. In all alternatives, the Service would continue the 1998 IPM Plan to lease land farming. In all alternatives the Service would continue to use PUPs authorized through the Lease Land PUP Committee as the master set of pesticides that can be used for agricultural uses on leased land and cooperative farm units on Tule Lake Refuge.

77.    Alternative A is the "no action" alternative, which continues current management.

78.    Alternative B is the same as Alternative A, allowing the same agricultural use of pesticides pursuant to the PUP process. The Service states it would work with the Bureau of Reclamation to periodically conduct water, sediment, and fish and wildlife tissue monitoring in Tule Lake Sump 1A to ensure pesticides are at concentrations below those having an adverse effect to listed species and other wildlife, but does not state if or how tissue monitoring would affect the agricultural use of pesticides any differently than Alternative A.

79.    Alternative C is the same as Alternatives A and B, allowing the same agricultural use of pesticides pursuant to the PUP process. The Service states it would work with the Bureau of Reclamation and growers to expand the area of lease land and cooperatively farmed units that are managed organically by expanding incentives such as lease extensions. It is not evident that the Service does not already work with the Bureau in this manner under Alternative A, and there is no guarantee that the areas managed organically will increase, or that the agricultural use of pesticides will be reduced, because Alternative C does not require it.

80.    Based on the PUP process, the Service considers the effects on soils from pesticide applications " negligible" for all alternatives. The specific information the Service relied upon to come to this conclusion for the pesticides authorized for agricultural use is not disclosed in the CCP/EIS.

81.    Based on the PUP process, under Alternative A, the Service states concentrations of pesticides in refuge waters would not be expected to be high enough to adversely affect waterbirds or other species of special management attention and impact to water quality from pesticide application would be minor. The specific information the Service relied upon to come to this conclusion for the pesticides authorized for agricultural use is not disclosed in the CCP/EIS. There is no discussion of impacts to water quality from pesticide applications for Alternatives B or C.

82.    Based on PUP process, the Service expects adverse effects on vegetation and habitat from pesticide applications to continue to be intermediate for all alternatives. The specific information the Service relied upon to come to this conclusion for the pesticides authorized for agricultural use is not disclosed in the CCP/EIS.

83.    Based on the PUP process, the Service states the adverse effects on fish and wildlife from pesticide applications is minor for all alternatives. The specific information the Service relied upon to come to this conclusion for the pesticides authorized for agricultural use is not disclosed in the CCP/EIS.

84.    The Service did not consider any of the following alternatives for agricultural uses of pesticides on the Tule Lake Refuge: one that would allow only organic farming on all cooperative farm units and/or lease land units; one that would restrict pesticide use to one application of a limited number of herbicides (as the Service currently does through the Special

Use Permits for the cooperative farm units on the Lower Klamath Refuge); one that would prohibit the use of insecticides; one that would prohibit the use of neonicitinoid insecticides; one that would prohibit crops such as potatoes and onions that involve extensive pesticide use; one that would prohibit aerial spraying to apply pesticides; one that would prohibit pesticides known to be harmful to wildlife; or one that would allow for public participation in the PUP process.

<u>Lower Klamath Refuge Alternatives</u>

85.    The Service considered four alternatives for the Lower Klamath Refuge. In all alternatives, the cooperative farming program is limited to small grains, most fields would be farmed organically, and for those fields farmed conventionally, no insecticides would be allowed and all other pesticides must be approved by the Service. In all alternatives, the lease land farming program is limited to small grains (no row crops). In all alternatives the Service would continue the 1998 IPM Plan to lease land farming. In all alternatives the Service would continue to use PUPs authorized through the Lease Land PUP Committee as the master set of pesticides that can be used for agricultural uses on leased land and cooperative farm units; however, the Service will also continue to limit the amount and type of pesticides used at Lower Klamath Refuge to one ground broadcast application of 2,4-D amine, MCPA, glyphosate, and/or dicamba through restrictions in the SUP.

86.    Alternative A is the "no action" alternative, which continues current management.

87.    Alternative B is the same as Alternative A, allowing the same agricultural use of pesticides. The Service would "formalize" the ongoing pest management for cooperative farming into an IPM program, but since it is "ongoing" this is no different than Alternative A.

88.    Alternative C is the same as Alternatives A and B, allowing the same agricultural use of pesticides. The Service states it would work to expand the area of lease land and

cooperatively farmed units that are managed organically by expanding incentives such as lease/permit extensions. It is not evident that the Service does not already do this under Alternative A, and there is no guarantee that the areas managed organically will increase, or that the agricultural use of pesticides will be reduced, because Alternative C does not require it.

89.     Alternative D is the same as Alternatives A, B, and C, allowing the same agricultural use of pesticides.

90.     Based on the PUP process, the Service considers the effects on soils from pesticide applications " negligible" for all alternatives. The specific information the Service relied upon to come to this conclusion for the pesticides authorized for agricultural use is not disclosed in the CCP/EIS.

91.     Based on the PUP process, under Alternative A, the Service states impacts to water quality from pesticide application would be minor. The specific information the Service relied upon to come to this conclusion for the pesticides authorized for agricultural use is not disclosed in the CCP/EIS. There is no discussion of impacts to water quality from pesticide applications for Alternatives B, C or D.

92.     Based on PUP process, the Service expects adverse effects on vegetation and habitat from pesticide applications to be negligible for all alternatives. The specific information the Service relied upon to come to this conclusion for the pesticides authorized for agricultural use is not disclosed in the CCP/EIS.

93.     Based on the PUP process, the Service states the adverse effects on fish and wildlife from pesticide applications is minor for all alternatives. The specific information the Service relied upon to come to this conclusion for the pesticides authorized for agricultural use is not disclosed in the CCP/EIS. Under Alternative B, the adverse effects of pesticide use could be

reduced if non-pesticide controls are adopted. Under Alternative C, the adverse effects of pesticide use could be reduced if areas that are farmed organically expand. Under Alternative D, the pesticide use impacts were not discussed.

94.     The Service did not consider an alternative for the Lower Klamath Refuge that would allow only organic farming on all cooperative farm units and/or lease land units.

Compatibility Determinations

95.     The Service recognized that evidence of adverse impacts associated with current agricultural pesticide use on the refuges is limited. The Service also found it important to note that dead or sick wildlife can be extremely difficult to locate and chronic or sub-lethal effects (reduction of growth, reproduction and survival) are more difficult to detect. The Service relies on the PUP process to evaluate the specifics of proposed chemicals to be compatible with wildlife conservation and waterfowl management. The specific information the Service relies upon in the PUP process to make compatibility determinations is not disclosed in the CCP/EIS.

96.     Despite a lack of information or a comparison of adverse effects, including indirect effects, from a reasonable range of alternatives, the Service determined that the use of pesticides on lease lands and cooperative farming units on Lower Klamath Refuge is compatible with wildlife conservation and for the major purpose of waterfowl management.

97.     The Service comes to the same conclusion for Tule Lake Refuge, despite the fact that the crops on the Tule Lake Refuge, in particular onions and potatoes, can be treated with a variety of pesticides, including herbicides, fungicides, insecticides and soil fumigants, on thousands of acres. The Service did not consider any alternatives to agricultural uses of pesticides on the Tule Lake Refuge that would have been more likely to be compatible with wildlife conservation and for the major purpose of waterfowl management, such as: allow only

organic farming on all cooperative farm units and/or lease land units; restrict pesticide use to one application of a limited number of herbicides (as the Service currently does through the Special Use Permits for the cooperative farm units on the Lower Klamath Refuge); prohibit the use of insecticides; prohibit the use of neonicitinoid insecticides; prohibit crops such as potatoes and onions that involve extensive pesticide use; prohibit aerial spraying to apply pesticides; or prohibit pesticides known to be harmful to wildlife.

## FIRST CLAIM FOR RELIEF
### (Violations of the National Environmental Policy Act)

98.    Plaintiff realleges and incorporates by reference the preceding paragraphs.

99.    The Service is a federal agency subject to NEPA, and the Service's adoption of the CCP through its issuance of the ROD is a major federal action significantly affecting the human environment.

### Count One: Reasonable Range of Alternatives

100.    Under NEPA, the Service must study, develop, and describe alternatives to the proposed action in every EIS, and analyze "all reasonable alternatives." *Id*. § 4332(C)(iii), (E); 40 C.F.R. § 1502.14. This requirement allows the agency and the public to consider alternatives that would "avoid or minimize adverse effects." 40 C.F.R. §§ 1500.2(e), 1502.1.

101.    The Service failed to consider reasonable alternatives to the proposed action that would avoid or minimize adverse effects, including by refusing to analyze any alternatives that would eliminate the use of pesticides or, for Tule Lake Refuge, reduce the use of pesticides by any the following: restricting pesticide use to one application of a limited number of herbicides, (as the Service currently does on the cooperative farm units on the Lower Klamath Refuge); prohibiting the use of insecticides or neonicitinoid insecticides; prohibiting crops such as potatoes and onions that involve extensive pesticide use; or prohibiting aerial spraying to apply

pesticides. The Service also refused to consider an alternative that would make the PUP process public and subject to public comment. These alternatives would meet the purpose and need for the CCP.

102.    By not analyzing any alternatives to the current manner of agricultural pesticide use, the Service denied itself and the public the benefit of considering and comparing the effects of fewer or no pesticides on Tule Lake and Lower Klamath Refuges.

103.    The Service's failure to consider a reasonable range of alternatives is arbitrary, capricious, and abuse of discretion, and not in accordance with NEPA, and, therefore, the CCP/EIS must be set aside in accordance with the APA. 5 U.S.C. § 706(2)(A).

<u>Count Two: Direct, Indirect, and Cumulative Impacts</u>

104.    NEPA requires discussion of all environmental impacts of a proposed action, including direct, indirect, and cumulative impacts when added to other past, present, and reasonably foreseeable future actions. 40 C.F.R. §§ 1508.7, 1508.8, 1508.25(c).

105.    The Service failed to analyze the specific direct, indirect, and cumulative impacts of the agricultural application of pesticides on Tule Lake and Lower Klamath Refuges in the CCP/EIS. The Service's general statements of potential effects and lists of pesticides authorized for use do not satisfy the Service's NEPA duties to disclose and analyze the specific effects of agricultural application of pesticides. The Service's reliance on the 1998 programmatic IPM Plan, the 2007 programmatic biological opinion, and the programmatic PUP process do not satisfy the Service's present NEPA duties to disclose and analyze the specific effects of the decision in the ROD to adopt the CCP, which decides to allow the agricultural use of pesticides—meaning effects from the actual application of pesticides to agricultural crops on the Tule Lake and Lower Klamath Refuges.

106.    For example, in the CCP/EIS, the Service does not disclose or analyze any of the specific direct effects on refuge birds, fish, frogs, pollinators and other insects, or other wildlife, plants, or their habitats from the current use of particular pesticides, such as chlorpyrifos, imidacloprid, thiamethoxam, mancozeb, chlorothalonil, dicamba, or 2,4-D, or any other pesticide or combination of pesticides or category of pesticides. Nor does the Service disclose or analyze specific indirect effects on any refuge particular species or their habitats, such as impacts on certain species from the loss of insects as food sources for birds or as pollinators. The Service does not disclose the cumulative effects of the combination of pesticides approved for agricultural use on the refuge or   or refuge birds, fish, frogs, insects or other wildlife or their habitats from the current use of particular pesticides that may or may not have been discussed in the non-public PUP process

107.    The Service's failure to consider the direct, indirect, and cumulative effects is arbitrary, capricious, and abuse of discretion, and not in accordance with NEPA, and, therefore, the CCP/EIS must be set aside in accordance with the APA. 5 U.S.C. § 706(2)(A).

Count Three:  Public Disclosure of Information and Ability to Meaningfully Participate

108.    The Service must make high quality and scientific information about the effects of the agricultural application of pesticides available to the public in the EIS. 40 C.F.R. § 1500.1(b); 40 C.F.R. § 1502.24.

109.    The Service failed to support its statements that the effects of agricultural application of pesticides on soil, water quality, vegetation and habitat, and fish and wildlife would be "negligible" or "minor" with evidence that the agency made the necessary environmental analyses. The Service does not disclose any of the information evaluated or relied upon in the PUP process.

110.    The Service must determine if incomplete or unavailable information is relevant and essential to a reasoned choice whether the cost of obtaining such information is not exorbitant. 40 C.F.R. § 1502.22.

111.    The CCP/EIS states that current contaminant threats and impacts on wetlands from pesticide applications were uncertain due to lack of monitoring data, and specific assessments do not exist, but does not assess the overall costs of obtaining such information.

112.    The Service's failure to consider disclose or make available to the public pertinent information or otherwise disclose that the information as too costly to obtain is arbitrary, capricious, and abuse of discretion, and not in accordance with NEPA, and, therefore, the CCP/EIS must be set aside in accordance with the APA. 5 U.S.C. § 706(2)(A).

<u>SECOND CLAIM FOR RELIEF</u>
**(Violations of the National Wildlife Refuge System Administration Act)**

113.    Plaintiff realleges and incorporates by reference the preceding paragraphs.

114.    Under the Refuge Act, as amended by the Improvement Act, the Service must provide for the conservation of fish, wildlife, and plants, and their habitats, and "ensure that the biological integrity, diversity, and environmental health" of national wildlife refuges are maintained. 16 U.S.C. § 668dd(a)(4)(A), (B).

115.     Neither the FEIS nor the ROD demonstrates that the CCP will ensure the biological integrity, diversity, and environmental health of the Klamath Basin Refuges or provide for the conservation of fish, wildlife, and plants, and their habitats because the Service did not evaluate the specific adverse effects of pesticides approved for use..

116.    The Service "shall not initiate or permit a new use of a refuge or expand, renew, or extend an existing use of a refuge, unless [it] has determined that the use is a compatible use." *Id*. § 668dd(d)(3)(A). A "compatible use" is any use of a refuge that, based on "sound

professional judgment, [] will not materially interfere with or detract from the fulfillment of the mission of the System or the purposes of the refuge." *Id.* § 668ee(1); 50 C.F.R. § 25.12.

117.    The Service failed to rationally justify its determinations that agricultural use of pesticides on Tule Lake and Lower Klamath Refuges will not materially interfere with or detract from the fulfillment of the mission of the Refuge System or the purposes of those refuges.

118.    The Service's compatibility determinations for agricultural use of pesticides on Tule Lake and Lower Klamath Refuges were not based on "sound professional judgment" because the Service did not use available science and resources concerning the specific adverse effects of pesticides approved for use, including but not limited to information that may be discussed in the PUP process.

119.    Further, the Service may only authorize an economic use of a refuge if the use "contributes to the achievement of the national wildlife refuge purposes or the National Wildlife Refuge System mission." 50 C.F.R. § 29.1.

120.    The Service failed to make determinations that agricultural use of pesticides contributes to the achievement of the Refuge System or the purposes of the Tule Lake or Lower Klamath Refuges, or to rationally justify such determinations if it made them because the Service did not evaluate the specific adverse effects of pesticides approved for use.

121.    Defendant's failure to comply with the Refuge Act, as amended, and its implementing regulations and policies is arbitrary, capricious, an abuse of discretion, and not in accordance with law, and, therefore, the CCP/EIS must be set aside in accordance with the APA. 5 U.S.C. § 706(2)(A).

### THIRD CLAIM FOR RELIEF
**(Violations of the Kuchel Act)**

122.    Plaintiff realleges and incorporates by reference the preceding paragraphs.

123.     The 1964 Kuchel Act confirmed that the primary purpose of the Klamath Basin Refuges is wildlife conservation. 16 U.S.C. § 695l. The Act further provides that the lands "shall" be managed for wildlife conservation, with a major purpose of waterfowl management, allowing agricultural use only to the extent it is "consistent therewith." *Id.*

124.     Agricultural use of pesticides as authorized under the CCP is not consistent with the purposes for which the Tule Lake and Lower Klamath Refuges were established—as preserves and breeding grounds for native birds and other wildlife, for waterfowl management, and for wildlife conservation.

125.     The Service failed to consider whether the "optimum agricultural use" of the Tule Lake and Lower Klamath Refuges includes the application of numerous pesticides.

126.     Defendant's interpretation of the Kuchel Act, as well as its determination that agricultural use of pesticides as currently practiced or authorized under the CCP is consistent with wildlife conservation and other refuge purposes, is arbitrary, capricious, an abuse of discretion, violates the law, and, therefore, the CCP/EIS must be set aside in accordance with the APA. 5 U.S.C. § 706(2)(A).

## REQUESTS FOR RELIEF

WHEREFORE, the Center for Biological Diversity respectfully requests that the Court grant the following relief:

A.     Declare that the Service violated the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 *et seq.*, by issuing an EIS that did not comply with NEPA's requirements to analyze a reasonable range of alternatives, or disclose and consider the direct, indirect, and cumulative impacts of the CCP, or disclose sufficient information to allow the public to meaningfully participate;

B.    Declare that the Service violated the National Wildlife Refuge System Administration Act (Refuge Act), as amended, 16 U.S.C. § 668dd–668ee, by issuing a CCP and ROD and by making compatibility determinations that fail to fulfill the Refuge System mission and that authorize uses that are incompatible with refuge purposes;

C.    Declare that the Service's issuance of the CCP and ROD violated the Kuchel Act, 16 U.S.C. § 695k–r, by issuing a CCP and ROD that authorize agricultural uses of pesticides that are inconsistent with refuge purposes;

D.    Declare that the Service's issuance of the EIS, CCP, and ROD is arbitrary, capricious, an abuse of discretion, and/or not in accordance with the law under the Administrative Procedure Act, 5 U.S.C. § 706(2)(A);

E.    Set aside and vacate the EIS, CCP, and ROD;

F.    Enjoin the Service from allowing the agricultural use of all or certain pesticides on Tule Lake and Lower Klamath Refuges until the Service completes a CCP in compliance with NEPA, the Kuchel Act, and the Refuge Act; or enter such other temporary, preliminary, and/or permanent injunctive relief as the Center may request hereafter;

G.    Award the Center its reasonable costs, litigation expenses, and attorneys' fees associated with this litigation pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412 *et seq.*, and/or all other applicable authorities; and

///

///

///

///

H.      Grant such further relief as the Court deems just and appropriate to provide the

Center with relief and protect the public interest.

Dated: March 23, 2017                  Respectfully submitted,


                                        s/ Stephanie M. Parent
                                       Stephanie M. Parent (OSB #925908)
                                       Center for Biological Diversity
                                       PO Box 11374
                                       Portland, Oregon 97211
                                       (971) 717-6404
                                       sparent@biologicaldiversity.org

                                       Hannah M. M. Connor
                                       (*Pro Hac Vice Pending*, FL Bar #125378)
                                       Center for Biological Diversity
                                       PO Box 2155
                                       St. Petersburg, Florida 33731
                                       (202) 681-1676
                                       hconnor@biologicaldiversity.org

                                       Attorneys for Plaintiff